**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| THE BOARD OF REGENTS, | § | |
| THE UNIVERSITY OF TEXAS SYSTEM, | § | |
| ON BEHALF OF THE UNIVERSITY OF | § | |
| TEXAS AT AUSTIN | § | A-06-CA-950 LY |
| | § | |
| v. | § | |
| | § | |
| KST ELECTRIC, LTD. | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:  THE HONORABLE LEE YEAKEL
      UNITED STATES DISTRICT JUDGE

The Magistrate Court submits this Report and Recommendation to the United States District

Court pursuant to 28 U.S.C. §636(b) and Rule 1 of Appendix C of the Local Court Rules of the

United States District Court for the Western District of Texas, Local Rules for the Assignment of

Duties to United States Magistrate Judges.  Before the Court are Defendant's Motions for Summary

Judgment (Clerk's Doc. No. 37 & 38).  On November 26, 2007, Judge Yeakel referred all dispositive

motions to the Court for a Report and Recommendation.

**SUMMARY JUDGMENT STANDARD OF REVIEW**

Summary judgment shall be rendered when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law.  FED. R. CIV. P. 56(c);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986);  *Ragas v.*

*Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact

is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the

nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Ragas*, 136 F.3d at 458.  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary-judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary-judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary-judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992).  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.*  If the

nonmoving party fails to make a showing sufficient to establish the existence of an element essential

to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.

*Celotex*, 477 U.S. at 322-23.

## BACKGROUND

In this case the University of Texas ("UT") is suing KST Electric ("KST") for a number of

state and federal trademark claims,[1] alleging that several logos developed and used by KST infringe

on UT's registered trademark that depicts its mascot, a longhorn steer, in silhouette (referred to by

UT as its "longhorn silhouette logo" or LSL).   *See* Appendix A (depicting the Longhorn logo).

KST was started by Kenneth and Suanna Tumlinson in 1994.  They are avid fans of the

University of Texas athletics and have had season tickets to the football games for many years.  In

1998, KST designed what the Court will refer to as the Longhorn Lightning Bolt Logo (or "LLB

Logo").  The logo's design consists of a longhorn silhouette with a "K" on the left cheek area of the

longhorn, an"S" on the right cheek area, a "lightening bolt T" in the face of the silhouette, and the

words "ELECTRIC, LTD." in the space between the horns.  *See* Appendix A (depicting LLB Logo).

In March 2002, when UT asserts it learned of the LLB Logo (a date disputed by KST), UT

asked KST to cease and desist using that logo.  KST refused.  Eventually, in December 2006 UT

filed suit.  KST now moves for summary judgment on a number of affirmative defenses and on the

merits of some of UT's claims.

---

[1]Those claims are: federal dilution, dilution under Texas law, federal trademark infringement, Texas statutory trademark and service mark infringement, Texas common law trademark and service mark infringement, federal unfair competition, Texas common law unfair competition, and unjust enrichment.  *See* Plaintiffs' Complaint at 7-8.

**ANALYSIS**

KST has filed two motions for summary judgment. The first addresses several affirmative defenses KST has raised, and seeks summary judgment on these defenses: (1) laches; (2) estoppel by laches; and (3) the statute of limitations. In a separately filed motion, KST also moves for summary judgment on UT's federal trademark infringement, federal unfair competition, and federal dilution claims. The Court will address the affirmative defenses first.

**A.     KST's AFFIRMATIVE DEFENSES**

Before addressing the substance of KST's affirmative defenses, the Court must first discuss some basic legal principles in this area. The Court will then discuss the merits of KST's arguments.

**1.      Applicable Principles.**

KST contends that to prevail on a laches defense a defendant must show plaintiff unreasonably delayed in filing suit, and the defendant suffered prejudice caused by that delay. *See* KST's Laches Motion at 9 (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998). For KST's estoppel by laches defense (which it also refers to as "acquiescence"), it contends that a defendant must further show reliance on plaintiff's acquiescence. *Id.* at 9 (citing same).

This appears to be a mistaken conception of the defenses, both theoretically and as a statement of the law in this circuit.[2] But this is perhaps understandable. Case law has been less than lucid at times in making the distinction, if any, between a laches defense and an estoppel by laches defense. A leading trademarks treatise notes that courts have conflated the difference, as it sees it, between laches – which simply means an unreasonable delay in filing suit – and estoppel by laches – where the delay in filing suit causes prejudice (positing that this is perhaps because of the

---

[2] KST seems to acknowledge this in their Reply. *See, e.g.,* Clerk's Doc. No. 45 at 8.

conflation of the terms in patent cases). *See* 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 31:2 (4th ed. 2007). This is further complicated by the oft-used (in the case law) but poorly defined term, "acquiescence," a related affirmative defense in trademark cases. *Id.* As UT correctly points out, some district courts in this circuit appear to have conflated laches and estoppel by laches. *See, e.g., H.G. Shopping Centers L.P. v. Bierney*, 2000 WL 33538621, at *5, (S.D. Tex. Nov. 29, 2007) (conflating laches and estoppel by laches defense); *Leatherwood v. Defense Procurement Mfg. Services*, 2004 WL 691218, at * 6 (N.D. Tex. March 16, 2004) (committing same transgression).

The Fifth Circuit's jurisprudence has been more clear. The circuit usually talks in terms of "laches." The Fifth Circuit has held that "laches is commonly defined as an inexcusable delay that results in prejudice to the defendant." *Westchester Media v. PRL USA Holding, Inc.*, 214 F.3d 658, 668 (5th Cir. 2000); *see also Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985). Laches comprises three elements: (1) delay in asserting one's trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay. *Elvis Presley Enters.*, 141 F.3d at 205; *see also Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1161 (5th Cir. 1982).

The Fifth Circuit treats acquiescence as a separate defense. *Elvis Presley Enters.*, 141 F.3d at 206. In order to establish the defense of acquiescence, a defendant must prove that: (1) the plaintiff knew or should have known of the defendant's use of the trademark; (2) the plaintiff made implicit or explicit assurances to the defendant; and (3) the defendant relied on the assurances. *Conan Properties*, 752 F.2d at 153; *see also Westchester Media*, 214 F.3d at 668.

Given all this, the Court believes that UT lays out the correct rubric for analyzing KST's defenses: laches and estoppel by laches should be analyzed as one defense; and acquiescence as a separate defense.  (KST's statute of limitations defense is also an independent claim and will be addressed separately.)

### 2.    Laches

As noted above, laches comprises three elements: (1) delay in asserting one's trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay. *Elvis Presley Enters*., 141 F.3d at 205.  The period for laches begins when the plaintiff knew or should have known of the infringement.  *Id*.  Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts.  *See Conan Properties*, 752 F.2d at 151-52.

KST contends that UT was aware as early as 1999 that KST was using the LLB Logo when KST attempted to advertise in a UT football program, yet UT waited until December 2006 to file suit.  Specifically, KST claims that after it submitted its proposed advertisement using the LLB Logo it was told by the publishing company UT was working with on the programs that it could not use that particular advertisement given the similarity of the LLB Logo and the UT mark.  KST claims the (as yet) unidentified publishing company salesman was UT's authorized agent.  It points to the contracts UT had with the advertising firms charged with putting together the ads in the programs.  These contracts state, in essence, that the firms would submit the ads to UT for its approval prior to the ads running.  *See, e.g.*, KST's Laches Motion, Exh R at 15 § E.  Kenneth Tumlinson, for his part, testified that he could not recall whether KST had used its logo in the proposed advertisement.  *See* KST's Laches Motion, Exh A at 83-84.  Suanna Tumlinson, at her first deposition in August 2007,

could not remember whether KST had advertised with the LLB Logo in UT's football programs, but, upon prompting, was able to recall placing an ad.  However, she was not able to recall exact dates or any other specifics.  At her second deposition, however, she testified that she could "remember this very clearly," *see* Defendant's Laches Motion, Exh E at 85, "this" being placing the ad in the football program.  She characterized the salesman as representing himself as working for UT and that the salesman told her that the LLB Logo was too similar to UT's mark, therefore the ad could not be run.  *Id.* at 87-88.  KST contends that this is "indisputable evidence" that UT knew of the LLB Logo at least as early as 1999.[3]

Whether the statements of this unnamed salesman are hearsay or an admission of a party opponent is the foundational issue here.  *See* FED. R. EVID. 801(d)(2) (laying out requisites for admission of party opponent's out-of-court statements).  For this anonymous salesman's statements to bind UT, he must have had actual or apparent authority to act as UT's agent.  *Texas Soil Recycling, Inc. v. Intercargo Ins. Co.*, 273 F.3d 644, 650 (5th Cir. 2001) ("Without actual or apparent authority, an agent may not bind a principal.").  Suanna Tumlinson testified that the salesman represented himself as UT's agent.  However, looking at the evidence in the light most favorable to UT (as the Court must), it appears that there is a fact question as to whether this anonymous salesman was in fact an agent for UT.  The Fifth Circuit has held that a party cannot bootstrap a hearsay declaration by an alleged agent into an admission of a party opponent by an out-of-court

_____

[3]KST also denigrates as a as "a self-serving declaration" Craig Westemeier's sworn statement – Westemeier is the Director of UT's Office of Trademark Licensing – that UT was not made aware of the LLB Logo in 1999, and also complains that it was presented after discovery had ended.  KST neglects to mention, however, that Westemeier's declaration was occasioned by Suanna Tumlinson's deposition testimony – on what was apparently the very last day of discovery – that she now remembered in great detail what was quite foggy only a few months before.

declaration by that same alleged agent. *See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 264 n.14 (5th Cir. 1980) ("evidence of the alleged agent's reputation as the agent of the alleged principal, and the out-of-court declarations of the alleged agent are all incompetent to prove the existence of an agency relationship"). More than that, it is clear that a court may not consider hearsay evidence in depositions submitted to defeat (or here, prevail on) a summary judgment motion and the Supreme Court impliedly adheres to this rule. *Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir.1992); *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir.1990); *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 570 n. 4 (7th Cir.1989); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 n. 19 (1970). The leading commentators endorse this rule as well. 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 2722 at 48-49 ("Only that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary judgment motion . . . .").[4]

The Court cannot answer whether the salesman's hearsay statements are in fact admissible because it cannot answer the foundational question of whether he was imbued with apparent or actual authority, *i.e.*, whether he was an agent of UT. KST again points to the contracts UT had with the companies as evidence that the salesman was UT's agent. But this just muddies the waters further because it is not clear whether the salesman would have been acting within the scope of his real or apparent authority when he allegedly "policed" UT's mark.[5] *See Kubow v. Hartford Cas. Ins. Co.*,

---

[4]Further, the stark difference between Suanna Tumlinson's testimony in her first and second depositions itself appears to create a fact question regarding this issue.

[5]As noted in the text, the contract provided that the company was to send a prospective ad to UT for approval prior to the ad running. There is no evidence in the record regarding whether this in fact happened with KST's originally proposed ad (containing the LLB logo). Rather, all we have is Suanna Tumlinson's testimony that the unnamed salesman stated that the ad was too similar to

475 F.3d 672, (5th Cir. 2007) ("It is true that Hartford, as principal, can be bound by acts of its agent that are within the scope of the agents real or apparent authority"); *Castillo v. State Farm Lloyds*, 210 Fed App'x 390 (5th Cir. 2006) ("Under Texas law, agents are generally not liable for contracts entered into on behalf of a principal or for any actions that are not within the scope of their authority"). In other words, the deeper the digging into the evidence gets, the less clear the picture becomes regarding who knew what when.

Viewing all the evidence "in the light most favorable to the nonmoving party," *Matsushita*, 475 U.S. at 587, there is obviously a question as to the material fact of when UT knew (or should have known) about the LLB Logo. Perhaps UT did know – or should have known – in 1999 and slept on its claim. Perhaps Westemeier is correct and UT was never shown the proposed ad in 1999. The salient point is this is exactly the type of credibility or factual determination that the jury system is intended to address. *See Carroll v. Metropolitan Ins. and Annuity Co.*, 166 F.3d 802, 807 (5th Cir. 1999) ("As our summary judgment practice mandates, neither we nor the district court should purport to resolve disputes of this nature at this stage of the litigation; findings involving material facts genuinely in dispute are reserved to the finder of fact, whether judge or jury, at the trial stage of such proceedings.").

KST makes an alternative argument in support of its laches defense based upon the fact that UT sent a cease and desist letter to KST on March 14, 2002, *see* UT's App'x, Exh 26,[6] and yet UT waited until December 2006 – roughly four-and-a-half years later – to file suit. KST contends that

_____

UT's logo to be permitted.

[6]UT claims that it first learned of the LLB Logo in March 2002 when an advertisement KST took out for the Star of Texas Rodeo was brought to UT's attention.

this constitutes unreasonable delay, independently supporting its laches defense. *See* KST's Laches Motion at 11-12.

Because the Lanham Act does not contain a statute of limitations, federal courts have referred to analogous state statutes of limitations to determine whether a presumption of laches should apply. *See Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985) ("When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so."); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) ("Although laches is an equitable defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant in the application of a laches defense [in Lanham Act cases].").

Although it does not seem as though the Fifth Circuit has ruled on this specific issue, other circuit courts have taken a somewhat uniform approach, granting at least a two-year window, and sometimes more, for the owner of a mark to file a claim. *See e.g., Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 942 (9th Cir. 2006) (statute of limitations is same for California state trademark infringement claims, four years); *cf. Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123, 139 (3rd Cir. 2005) (Lanham Act false advertising claim subject to six-year limitations period under Pennsylvania law). *See also Island Insteel System, Inc. v. Waters*, 296 F.3d 200, 207-08 (3rd Cir. 2002) (Lanham Act trademark infringement claims subject to a two-year statute of limitation period under Virgin Island law); *Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1203-06 (11th Cir. 1997) (four-year statue of limitations applies to trade dress claim under Georgia law); *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. 1985) (three-year limitations period applies under Tennessee law for trademark

infringement claims).  A 1996 district court from the Southern District of Texas, relying largely on Southern District of New York cases, held that Lanham Act claims are subject to the four-year statute of limitations period for a fraud claim.  *Derrick Mfg. Corp. v. Southwestern Wire Cloth, Inc.*, 934 F. Supp. 796, 804-05 (S.D. Tex. 1996).

But this is all largely academic.  A laches defense requires that there be *inexcuseable* delay in asserting one's trademark rights.  *Elvis Presley Enters*., 141 F.3d at 205.  "Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts."  *Id.*  Thus the only delay relevant to the laches defense is the delay between when UT became aware of KST's use of its logo, and when UT objected to that use with its cease and desist letter.  Here, taking the evidence in the light most favorable to the non-movant, UT, it looks as though not only was there no unexcused delay, there was no delay at all.  UT asserted its rights weeks, if not days, after the date it contends it discovered the LLB logo.  *See* UT's App'x, Exh 26.  Although KST disputes that UT only learned on the logo in 2002, the Court cannot accept KST's version of events at this stage, and must view the evidence in the light most favorable to UT. Given that there are multiple material fact issues outstanding on KST's affirmative defense of laches (or, alternatively termed, estoppel by laches), the Court RECOMMENDS that KST's motion for summary judgment on its laches defenses by DENIED.[7]

---

[7] Given that there are material fact question as to the first two elements of the laches defense, there is no need to consider the final element of whether KST was prejudiced by the delay.  *Elvis Presley Enters*., 141 F.3d at 205.

### 3.      Statute of Limitations

The analysis above provides a good segue to KST's statute of limitations defense.  KST claims that all of UT's state law claims related to the Discontinued Longhorn Logo[8] are time-barred because that logo was not in use after 2004, more than two years before suit was filed.  KST states that, as its moniker implies, it no longer uses that logo.  *See* KST's Laches Motion at 6. There is no dispute between the parties that the applicable statute of limitations for these claims is two years. While the parties spend a good deal of time in their briefs discussing the law with regard to the continuous tort doctrine, *see Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070,  1082 n.17 (5th Cir. 1997), and its application to this case, the Court need not reach that issue.  There is plainly a genuine issue of material fact as to whether KST has in fact discontinued using the "Discontinued Longhorn Logo."  *See* KST's Laches Motion, Exh M at 14-22 (KST employee Barry Carter stating that he had a pen with the discontinued logo on it in his pocket at his deposition and testifying that the Discontinued Longhorn Logo was on KST trucks as late as 2007).

In its Reply, KST makes an additional argument that summary judgment should also be granted as to all of UT's state claims for relief related to the LLB logo because the statute of limitation bars them.  As a general matter, because there is no dispute that KST continues to use the LLB logo even today, a complete summary judgment on the limitations defense regarding the LLB logo is not possible.  Although its request is not styled this way, KST is in fact asking for a partial summary judgment on this claim, requesting a judgment in its favor on any claim UT has regarding the LLB logo that is based on a use of that logo more than two years before the date of suit.

_____

[8]The Discontinued Longhorn Logo is the same as the LLB Logo except that it has no lightning bolt on it.  *See* Appendix A to this Report & Recommendation.

12

For several reasons, the Court recommends that this alternative request be denied.  As an initial matter, it was raised for the first time in KST's reply, and thus the briefing on the issue is inadequate.  Second, the only impact such a judgment would have would be on damages, as there is no question that UT's claims *within* two years of the date of suit are timely.  Given the inadequacy of the briefing, and the limited utility of granting a partial summary judgment at this time, the Court declines to make the recommendation requested by KST.[9]

Accordingly, the Court RECOMMENDS that KST's motion for summary judgment on the statute of limitations defense be DENIED.

## 4.     Acquiescence

KST also requests judgment on its acquiescence defense.  It contends that because it has done work for UT in the past number of years and in doing that work its trucks with the LLB Logos on them have been parked at worksites on UT's campus, UT must have acquiesced in KST's use of the mark.  However, the law in this circuit regarding the acquiescence defense is quite clear: the time-period after UT sent a cease and desist letter to KST cannot be taken into consideration insofar as the acquiescence defense is concerned.  *Elvis Presley Enters.*, 141 F.3d at 206.  And this is exactly the time-period – after the cease and desist letter of March 2002 – that KST largely points to in trying to prove up its affirmative defense.  Therefore, the Court RECOMMENDS that KST's motion for summary judgment on its acquiescence defense be DENIED.

---

[9]KST may of course revisit this issue at trial, with a Rule 50 motion, or in its requested instructions on damages.

**B.      TRADEMARK CLAIMS**

KST, in a second, separately filed motion moves for summary judgment on UT's federal

trademark infringement, federal unfair competition, and federal dilution claims ("KST's Dilution

Motion").[10]

### 1.      Trademark Infringement and Unfair Competition

The elements of a trademark infringement claim are laid out in 15 U.S.C. § 1114:

(1) Any person who shall, without the consent of the registrant –

> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive

> * * *

> shall be liable in a civil action by the registrant for the remedies hereinafter provided

Lanham Act § 32, 15 U.S.C. § 1114. The requirements for establishing an unfair competition cause

of action are:

> [a]ny person who, in connection with any goods . . . uses in commerce any word, term, name . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person[.]

---

[10] In its briefing, KST makes several references to the fact that it is a small business, and UT a huge public university. Such arguments are irrelevant to the legal issues before this Court, however. Simply because a defendant is small and local does not mean that it cannot infringe another's trademark. *See General Elec. Co. v. Speicher*, 877 F.2d 531, 537 (7th Cir. 1989) ("Small local businessmen of good repute do not have a license to steal trademarks from large nonresident corporations, and the amount of harm that the infringer inflicts goes to the amount of damages rather than to his liability for damages; the trademark laws do not excuse modest infringements by petty pirates.").

Lanham Act §43(a), 15 U.S.C. § 1125(a)(1)(A).

For both the trademark infringement and unfair competition causes of action, the element in play here is "likelihood of confusion." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 447, 483 (5 th Cir. 2004) ("To prove trademark infringement and unfair competition under federal law, Scott Fetzer must show that the use of the KIRBY mark by House of Vacuums is likely to cause confusion among consumers as to the source, affiliation, or sponsorship of House of Vacuums's products or services."); *Int'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir. 1996) ("likelihood of confusion often is the dispositive inquiry in a Lanham Act case."). Likelihood of confusion is generally a "fact-intensive inquir[y], *Society of Fin. Examr's v. Natl'l Ass'n of Certified Fraud Examr's Inc.*, 41 F.3d 223, 224 (5th Cir. 1995), however, summary judgment is not precluded in all such cases. *King v. Ames*, 179 F.3d 370, 374 (5th Cir. 1999) ("Consequently, we reject King's argument that the issue of confusion may not be resolved on summary judgment, notwithstanding certain of our cases that suggest to the contrary.").

A "likelihood of confusion" means that confusion is not just possible, but probable. *Scott Fetzer*, 381 F.3d at 484. The confusion that both the trademark infringement and unfair competition statutory schemes aim to dissipate is not only as to source, but also as to affiliation, connection, or sponsorship. *See Champions Golf Club, Inc. v. The Champions Golf Club*, 78 F.3d 1111, 1116 (6th Cir. 1996) ("To frame it another way, the "ultimate question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."). As the Trademark Trial and Appeal Board put in *In re Opus, Inc.*,

> It is not necessary that these respective goods and services be identical or even competitive in order to support a finding of likelihood of confusion. Rather, it is sufficient that the goods and services are related in some manner, or that the circumstances surrounding their marketing are such, that they would be likely to be

encountered by the same persons in situations that would give rise, because of the marks used thereon, to a mistaken belief that they originate from or are in some way associated with the same source or that there is an association or connection between the sources of the respective goods or services.

2001 WL 1182924, 60 U.S.P.Q.2d 1812, 1814-15 (T.T.A.B. 2001).

In other words, the critical question is whether KST's logos suggest that it is in some way affiliated with or endorsed by UT. *Scott Fetzer*, 381 F.3d at 484-85. In assessing whether use of a mark creates a likelihood of confusion as to affiliation or endorsement, courts consider "digits of confusion," a list of factors that tend to prove or disprove that consumer confusion is likely. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664 (5th Cir. 2000). Those factors are: (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; and (7) any evidence of actual confusion. *Id.* The so-called "digits" are a flexible and nonexhaustive list. *See id.* They do not apply mechanically to every case and should be used only as guides. *Id.*

### a.        Type of Mark Allegedly Infringed

The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis. *See Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 123 (2d Cir.2001). The degree to which a senior user's mark is entitled to protection depends on whether the mark is classified as generic, descriptive, suggestive or fanciful/arbitrary. "The stronger the mark, the greater the protection it receives because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user." *Elvis Presley Enter.*, 141 F.3d at 201 (citations omitted). The strength of a trademark involves two components: its inherent or intrinsic distinctiveness and the distinctiveness it has acquired in the marketplace, *i.e.*, its commercial

16

strength. *See Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 130-31 (2d Cir. 2004). "[I]nherent distinctiveness, examines a mark's theoretical potential to identify plaintiff's goods or services without regard to whether it has actually done so . . . . [A]cquired distinctiveness, . . . looks solely to that recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services." *Id.*

UT's longhorn silhouette logo is a fanciful or arbitrary mark, *see* 1 & 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §§ 7:25, 7:35-37, at 7-69-77, 7-92-97, §§ 11.10-11.13, at 11-18-11-22 (4th ed.2006);[11] a longhorn silhouette is no way descriptive of UT's educational enterprise. These types of marks are generally "strong" marks, *cf. Esquire, Inc. v. Esquire Slipper Mfg. Co.*, 243 F.2d 540, 543-44 (1st Cir. 1957), and are therefore "accorded more protection under trademark law." *Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 461 n.7 (5th Cir. 2003). This factor, then, weighs in favor of confusion in the likelihood of confusion calculus.

### b.    Similarity Between the Two Marks

"[A]bsolute identity is not necessary for infringement; all that is necessary is enough similarity between the marks to confuse consumers." *Washington Speakers Bureau, Inc. v. Leading Authorities Inc.*, 33 F. Supp.2d 488, 497 (E.D. Va. 1998). Moreover, the greater the degree of similarity between the applicant's mark and the cited registered mark, the lesser the degree of similarity between the applicant's goods or services and the registrant's goods or services that is required to support a finding of likelihood of confusion. *In re Opus One, Inc.*, 2001 WL 1182924,

---

[11] Whether it falls into the precise category of fanciful or arbitrary is open to debate, but the relevant point is that both these types of marks are entitled to more protection than descriptive marks (which require secondary meaning). *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).

60 U.S.P.Q.2d 1812, 1815 (T.T.A.B. 2001).  The classic statement on similarity comes from Judge Walker's 1940 opinion:

> Of course, few would be stupid enough to make exact copies of another's mark or symbol.  It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts.

*Baker v. Master Printers Union of New Jersey*, 34 F. Supp. 808, 811 (D.N.J. 1940).

KST's argument that "[t]here are . . . a multitude of differences between the [LLB] and UT's registered longhorn logo," KST's Dilution Motion at 10, is difficult to swallow.  *Compare* UT's Longhorn Logo *with* depictions of various incarnations of KST's logos, in App'x A.  Nevertheless, KST gamely attempts to distinguish the two.  The ostensible distinctions include: (1) the tips of the horns on LLB logo are "bent" rather than straight; (2) the nose is rounded off on the LLB logo "as opposed to the indentation" in UT's logo, *see* KST's Dilution Motion at 10; (3) the ears of the LLB logo are rounded rather than pointed; and (4) there is of course the presence of a "K," an "S,  and lightning-bolt infused "T" in the LLB logo.  KST's attempt to draw these fine lines to distinguish its logo from UT's ultimately fails.  The marks are clearly saliently similar (one might posit that the LLB logo resembles an average artist's attempt to draw UT's mark).  Moreover, all that UT needs to show here is a "similarity between the marks to confuse consumers."  *Washington Speakers Bureau*, 33 F. Supp.2d at 497.  A simple viewing of the two marks demonstrates a substantial similarity between them.  This factor therefore weighs in favor of a finding of likelihood of confusion.

### c.    KST's Intent

KST contends that it did not copy the LSL in bad faith.  Instead, in 1998, when it decided to use a longhorn as the basis for its logos, it chose that particular design "to reflect [its owners'] life

experience with cattle and longhorns." *See* KST's Dilution Motion at 10. It further argues that it pulled the template for its longhorn-based logos from a book with barnyard animals and the like. *Id*, Exh F at 14.

Good faith is not a defense to trademark infringement. *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir. 1985). The reason for this is clear: if potential purchasers are confused, no amount of good faith can make them less so. Bad faith, however, may, without more, prove infringement. *Id*. Because "improper motive is rarely, if ever, admitted (and this case provides no exception), the court can only infer bad intent from the facts and circumstances in evidence." *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 1981 WL 40564, 212 U.S.P.Q. 170, 176 (N.D. Ga. 1981).

As UT points out, both Kenneth and Suanna Tumlinson testified that are life-long fans of UT athletics and were therefore aware of the LSL. Further, they operated their business (an electric company that has no obvious connection to cattle or longhorns) for a number of years before they adopted the LLB logo. *See* UT's Response at 12. The Tumlinsons testified that they owned a significant amount of UT apparel with the LSL on it. Thus, prior to adopting their logos, Defendants were well aware of the LSL, and its appearance. These facts provide circumstantial evidence that the Defendants adopted their logo with knowledge of its strong similarity to the LSL. Moreover, setting aside the similarities between the LSL and the LLB logos, the striking similarities between the Discontinued Longhorn Logo and the LSL were such that Kenneth Tumlinson putatively ordered those logos removed because they "resembled closer [*sic*] to the UT's logo [*sic*] than we wanted to [*sic*]." *See* KST' Dilution Motion, Exh A at 76. This factor also weighs in favor of likelihood of confusion.

### d.       Similarity of the Products or Services

The only other factor that KST takes up in its brief is the distinct customer bases of KST and

UT.  This is true.  However, as UT points out, this factor is not as weighty as the others given that

direct competition or intrinsic relatedness between the mark holder and the alleged infringer is not

required.  *See Professional Golfers Ass'n of Ameica v. Bankers Life & Cas. Co.*, 514 F.2d 665, 669

(5th Cir. 1975) ("This court has repeatedly held that direct competition is not the sine qua non of

trademark infringement; rather the gist of the action lies in the likelihood of confusion to the

public."); *see also Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1116 (7th

Cir. 1997) (holding same).

### e.       Material Fact Issue as to Likelihood of Confusion

It is worth reiterating that "the critical question is whether KST's logos suggest affiliation

or endorsement." *Scott Fetzer*, 381 F.3d at 484-85.  Despite the lack of overlap in their respective

customer bases – something that, in any event, is not required to create a fact question as to

likelihood of confusion – there is a fact issue as to KST's intent in designing the logos in question,

an issue which bleeds into the salient similarity between UT's mark and KST's logos.  Finally, UT's

mark is entitled to strong protection given its categorization.  In other words, UT has established a

material fact issue as to the likelihood of confusion element of its federal trademark infringement

and unfair competition causes of action.  Accordingly, the Court RECOMMENDS that KST's

motion for summary judgment on these claims be DENIED.

### 2.       Federal Trademark Dilution Claim

KST argues that it should be granted summary judgment on UT's federal dilution claim

because UT has not provided any evidence that the longhorn silhouette logo is famous for purposes

of the Trademark Dilution Revision Act ("TDRA").[12]  On October 6, 2006, President Bush signed

into law the Trademark Dilution Act of 2006 ("TDRA"), which amended the Federal Trademark

Dilution Act (FTDA).[13]  Under the TDRA, "the owner of a famous mark . . . shall be entitled to an

injunction against another person who, at any time after the owner's mark has become famous,

commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or

dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely

confusion, of competition, or of actual economic injury."  15 U.S.C. § 1125(c)(1).

Specifically, to state a dilution claim under the TDRA, a plaintiff must show:

(1)     that the plaintiff owns a famous mark that is distinctive;

(2)     that the defendant has commenced using a mark in commerce that
        allegedly is diluting the famous mark;

(3)     that a similarity between the defendant's mark and the famous mark
        gives rise to an association between the marks; and

(4)     that the association is likely to impair the distinctiveness of the
        famous mark or likely to harm the reputation of the famous mark.

See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 264-65 (4th Cir. 2007).

Under the TDRA, the owner of a famous mark has to establish a likelihood of dilution to obtain

monetary relief on a federal dilution claim under the Lanham Act.  See adidas America, Inc. v.

---

[12]KST is only moving for summary judgment on the "famousness" element of UT's dilution
cause of action, therefore, the Court will analyze only that discrete issue.

[13] Specific changes to federal dilution law under the TDRA include: (1) the establishment of
a "likelihood of dilution" standard for dilution claims, rather than an "actual dilution" standard; (2)
a provision that non-inherently distinctive marks may qualify for protection; (3) a reconfiguration
of the factors used to determine whether a mark is famous for dilution purposes, including a rejection
of dilution claims based on "niche" fame; (4) the specification of separate and explicit causes of
action for dilution by blurring and dilution by tarnishment; and (5) an expanded set of exclusions.
See 15 U.S.C. § 1125(c).

*Payless Shoesource*, ---- F. Supp. 2d ----, No. CV-01-1655-KI, 2007 Wl 4482201 at *23, (D. Or. Dec. 21, 2007); *Malletier v. Dooney & Bourke, Inc.*, 500 F. Supp. 2d 276, 280 (S.D.N.Y. 2007); 15 U.S.C. § 1125(c)(5).  The TDRA specifically requires that the mark be "*widely recognized by the general consuming public of the United States* as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A) (emphasis added); *adidas America*, 2007 WL 4482201 at *23.

Dilution is a cause of action invented and reserved for a select class of marks – those marks with such powerful consumer associations that even non-competing uses can impinge on their value.  *Avery Dennison Corp. v. Stanton*, 189 F.3d 868, 875 (9th Cir. 1999) (citing the seminal trademark article by Frank L. Schechter, *The Rational Basis for Trademark Protection*, 40 HARV. L. REV. 813 (1927), which proposed a cause of action for dilution).  Dilution causes of action, much more so than infringement and unfair competition laws, tread very close to granting "rights in gross" in a trademark.  *Id.*

The legislative history of the TDRA shows a similar concern.  Congress passed the anti-dilution legislation because it sought to protect unauthorized users of famous marks from those "attempt[ing] to trade upon the goodwill and established renown of such marks," regardless of whether such use causes a likelihood of confusion about the product's origin.  H.R.Rep. No. 104-374, at 3 (1995) *reprinted in* 1995 U.S.C.C.A.N. 1029, 1030.  The legislative history speaks of protecting those marks that have an "aura" and explains that the harm from dilution occurs "when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular."  *Id.*; S.Rep. No. 100-515, at 7 (1988).  For example, such harm occurs in the hypothetical cases of "DUPONT shoes, BUICK aspirin, and KODAK pianos,"

according to the legislative history.  *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 431 (2003) (quoting H.R.Rep. No. 104-374, at 3 (1995), as reprinted in 1995 U.S.C.C.A.N. 1029, 1030)).  This is true even though a consumer would be unlikely to confuse the manufacturer of KODAK film with the hypothetical producer of KODAK pianos.  *Louis Vuitton Malletier S.A. v. Haute Diggity Dog*, 507 F.3d 252, 268 (4th Cir. 2007).  In short, for purposes of § 1125(c), a mark usually will achieve broad-based fame only if a large portion of the general consuming public recognizes that mark. *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002).  In other words, the mark must be a household name.  *Id*.

Under the TDRA, four non-exclusive factors are relevant when determining whether a mark is sufficiently famous for anti-dilution protection:

> (i)     The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;
>
> (ii)    The amount, volume, and geographic extent of sales of goods or services offered under the mark;
>
> (iii)   The extent of actual recognition of the mark;
>
> (iv)    Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2).

Last things first.  The LSL is registered, and has been for over 20 years according to UT. KST does not dispute this.  However, as the leading commentator notes, "[o]ne cannot logically infer fame from the fact that a mark is one of the millions on the federal Register.  On the other hand, one could logically infer lack of fame from a lack of registration . . . ."  4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 24:106, at 24-293 (4th ed.).

KST's primary argument goes to the third issue, the actual recognition of the mark, and contends that UT's mark is not sufficiently recognized on a national level to be famous. They base this argument on their expert, Robert Klein, who conducted a national survey he contends demonstrates that only 5.8% of respondents in the United States "associated the UT registered longhorn logo with UT alone" and that "only 21.1% of respondents in Texas associated the UT registered longhorn logo with UT alone." *See* KST's Motion on Federal Dilution Claims at 7. As an initial matter, it simply does not matter, for purposes of a federal dilution cause of action, what the results are of a survey conducted of people in the Austin metropolitan area or the State of Texas. As noted above, the TDRA specifically requires that the mark be "*widely recognized by the general consuming public of the United States*." 15 U.S.C. § 1125(c)(2)(A) (emphasis added); *see also adidas America*, 2007 WL 4482201 at *23. The Court must presume that this is exactly why UT did not invoke, in its briefing on the dilution issue, the study it commissioned by a University of Houston professor that was conducted solely in the metropolitan Austin area. *See* Defendant's Motion, Exh C, at 1.

Instead, UT, via its expert, attacks the methodology and assumptions of Klein's nationwide survey, while championing its evidence, detailed in full below, that UT has permeated the national consciousness primarily through the success of its football program (circumstantial evidence that touches on the first two famousness factors). Klein conducted his survey using a test group and a control group. *See* KST's Dilution Motion, Exh B at 8. For the test group he used the UT LSL that is registered with the Federal Register (however he showed it to participants in white with a white background, rather than the burnt orange color it almost invariably appears in, or against). For the control group he used the longhorn or "the cow's head" from the Longhorn World Championship

24

Rodeo logo.  *Id*.[14]   Klein contends that he used this alternative longhorn depiction because "[r]espondents who associate the 'control' symbol with UT are either guessing or indicating that any depiction of a longhorn steer will be associated with UT."  *See* KST's Dilution Motion, Exh B at 8. Among the survey respondents in Texas – slightly less than half of the total survey respondents (the rest were from the different geographical regions across the U.S.) – who were shown the control logo, nearly 22% associated it with UT alone, and another 26.5% associated it with UT *and* another "company, organization, or place."  *Id*. at 8.  Across the rest of the United States, only 5.3% in the control associated it with UT alone (and an additional 6.1% with UT and some other entity).  *Id*. at 10.

UT raises several arguments contesting the validity of Klein's results.  First, it complains that Klein presented the LSL to the survey respondents in a biased fashion.  The evidence shows that Klein did not test the LSL in the burnt orange color in which it almost invariably appears (apparently survey respondents were shown a "whited out" version of the LSL).  KST's Dilution Motion, Exh G, at 109-117.  When confronted with this fact – that the mark he was ostensibly attempting to test was not being shown to the general consuming public in the manner in which they would be exposed to in the marketplace – Klein stated UT's mark, the LSL, is used in a wide variety of contexts, and picking any one of them would be to bias the results.  *Id*. at 113, 118.  This response seems disingenuous.  It is difficult to understand how it would bias the results to show the general consuming public the mark in the typical circumstance in which the public would confront that mark

---

[14] Note that in his survey Klein only used the longhorn portion of this graphic (*i.e.*, not the entire logo).

in the marketplace, rather than showing them it in a manner in which they would likely *not* confront it.[15]

UT also correctly points out that Klein's coding of a number of survey responses seemed designed to favor KST's position in the litigation.  For example, Klein did not count respondents who, upon seeing the LSL and being asked if they associated that mark with any "company, organization, or place," responded by stating "Texas football" or "the Texas Longhorns" because the response did not make a reference to an academic institution.  KST's Dilution Motion, Exh G, at 141-43.  Klein also admitted to numerous errors in coding the responses.  *See e.g.,* Exh G at 157.  Most troublesome is that the coding errors almost invariably were to the benefit of KST and the detriment of UT.  *See id.* at 141-163.  Klein was exacting when it came to what responses would be classified as validly associating the LSL with UT.  To give just one example, Klein coded a response that stated that s/he associated the LSL with "Texas college" and the reason for that being that "That's the image on helmets" as not being associated with UT.  *Id.* at 160-61.

UT also contends that Klein's survey question was "leading" because it asked respondents whether they associated the LSL with any "company, organization, or place" (thus implicitly directing respondents to simply say "Texas," which would then be coded unfavorably to UT).  UT also has pointed out flaws in the standard Klein used to determine whether a response should be

---

[15]The Court's view is supported by the leading treatise.  In a slightly different context – likelihood of confusion – McCarthy notes that while survey evidence "is sometimes said to be evidence of 'actual' confusion, it is so only to the extent that the survey *mirrors the real world setting* which can create an instance of actual confusion."  4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 23:2.50, at 23-16 (emphasis added).  The same overarching principle applies to a the dilution cause of action.  *See* 15 U.S.C. § 1125(c)(2)(A) (the TDRA specifically requires that the mark be "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner"); *see also adidas America*, 2007 WL 4482201 at *23.

coded as associating the LSL with UT alone (which is the only response which "counts" as demonstrating fame in Klein's survey).[16]

This is not the first time Klein has been criticized, *see Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*, 511 F. Supp. 2d 482, 499 (E.D. Pa. 2007) ("The Court finds that [Klein's] survey's use of the 'classic' control suffers from a significant shortcoming that limits its probative value in showing a likelihood of confusion between the brands."); *Avocados Plus, Inc. v. Johanns*, 2007 WL 172305, No. 02-1798, Slip Copy at *3, (D.D.C. Jan. 23, 2007) ("In any event, the [Klein's] survey itself is fatally flawed"), and the Court hopes "that he will take these criticisms to heart in his next courtroom appearance." *Indianapolis Colts,* 34 F.3d at 415 (Judge Posner noting that one of the parties' expert's study "was a survey that consisted of three loaded questions asked in one Baltimore mall."). These criticisms significantly undermine Klein's conclusion, and the Court must, at this stage of the litigation, find that KST has failed to demonstrate through its summary judgment evidence that the LSL is not "famous" for dilution purposes.

This, however, is not the end of the analysis. As the Supreme Court explained more than 20 years ago in its seminal summary judgment trilogy, if a summary judgment movant contests the existence of evidence to support an element of a claim on which the respondent bears the burden at trial, to avoid summary judgment, the respondent must come forward with sufficient evidence to at least demonstrate the existence of a triable fact issue on that element. *Celotex*, 477 U.S. at 322.

---

[16]Although not raised by UT, the court also notes that Klein's sample size of 454 seems small for a national sample. For example, that sample size would not pass muster for a reputable national poll (like a Gallup or Zogby). *See* Frank Newport et. al, *How Are Polls Conducted?*, in WHERE AMERICA STANDS (Michael Golay, ed. 1997), *available at* http://media.gallup.com/PDF/FAQ/HowArePolls.pdf. Gallup and other major polling and survey organizations typically have a sample size of 1,000 - 1,500 individuals for national polls. *Id.* at 3.

(summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). As applied here, because UT bears the burden of proof on the famousness issue at trial, this means that UT must submit sufficient evidence to demonstrate that there is at least a triable issue under the TDRA that the LSL is "famous."

In its response, UT offers evidence of famousness that at first blush appears impressive. Upon closer scrutiny, however, it is apparent that the evidence submitted is evidence of "niche" fame, which is a category of fame to which the TDRA explicitly does not apply. To summarize, UT's response contains evidence that UT football games are regularly nationally televised on ABC and ESPN, and the LSL is prominently featured as UT's logo during these broadcasts. *See* UT's Response, App'x B. Similarly, the men's college basketball team's games have been televised nationally 97 times in the past five seasons. *Id*. at 6. UT points to the Bowl Championship Series (BCS) Rose Bowl national championship game, in which UT beat the University of Southern California. That game was, at that point, the highest rated game in the eight-year history of the BCS and was also the highest rated college football game since 1987. *See* UT's Response, App'x A, at 6. Over 35 million people watched it nationwide. *Id*. Along these same lines, the 2006 Alamo Bowl game between UT and the University of Iowa was the most watched bowl game in ESPN's history, with nearly 9 million viewers. *Id*. at 7. Spanning from 1963-2006, UT football players have been featured solely or as a part of the cover of *Sports Illustrated* ten times (although the logo is not featured prominently or totally visible on all these covers). *See id*. at Exh. 8. A writer from SI.com (Sports Illustrated's website) named UT's football helmet as the number 1 *non-letter*, *i.e.*, only logo, helmet. *Id.* at Exh. 9. That same helmet was displayed on two separate Wheaties' boxes: one

28

celebrating UT's national BCS win and the other "commemorating UT's rivalry game with Texas A&M." *Id.*, App'x A at 6.  UT's sells "official corporate sponsorships" for $250,000 each (at a minimum) to companies such as Coca-Cola, Dodge, Nike, Pizza Hut, State Farm, and Wells Fargo. *Id.*, App'x B at 2.  The Collegiate Licensing Company (CLC), which licenses the merchandise for many if not most major universities,[17] reported that UT holds the record for most royalties earned in a single year and has been the number one university for licensing royalties for the past two years. *Id.* at Exhs. 4 &5.  Coming in closely behind Notre Dame, *Forbes* recently valued UT's football program as the second most valuable in the country.  *Id.* at Exh. 11.  Finally, retail sales of UT products in stores such as Wal-Mart and Target totaled nearly $400 million in 2005-06.  *Id.* at Exh. 3.[18]

UT contends that all of this is enough to at least create a fact issue at to whether the LSL is famous.  In support of this they cite an Eastern District of Virginia case for the proposition that 41% recognition by the general consuming public was enough for Ringling Bros. Circus' mark "Greatest Show on Earth" to be deemed sufficiently famous.  *Ringling Brothers-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Development*, 955 F. Supp. 605, 613 & n.4 (E.D. Va. 1997), *aff'd* 170 F.3d 449 (4th Cir. 1999).  The problem with this proposition is that this case was decided under the FTDA, which was amended by the TDRA in 2006.  One of the central revisions of the TDRA was to make it more difficult to get the "rights in gross" that a famous mark is entitled to.  *Avery*

---

[17]CLC's top ten clients in 2007 were UT, University of Notre Dame, University of Florida, University of Michigan, University of Georgia, University of North Carolina, University of Alabama, University of Oklahoma, University of Tennessee, and Pennsylvania State University.

[18] UT notes a few other pieces of evidence – for example, a *Texas Monthly* cover story with the LSL on it – however they have little to no relevance to determining the knowledge of the general consuming public.

*Dennison*, 189 F.3d at 875.  Getting rid of niche fame, the federal trademark law (as already noted) now requires that the mark be "widely recognized by the general consuming public of the United States."  15 U.S.C. § 1125(c)(2)(A) (emphasis added); *adidas America*, 2007 WL 4482201 at *23.

And the central problem for UT is that its circumstantial evidence is largely evidence of niche market fame.  Reading through the evidence, it is not at all clear that if one is not a college football fan (or, to a much lesser extent, college baseball or basketball fan) would recognize the LSL as being associated with UT, as all of the evidence relates to the use of the logo in sporting events.  The Court is well aware that NCAA college football is a popular sport – the Court counts itself as a more than casual fan of Saturday afternoon football in the Fall – but this hardly equals a presence with the general consuming public (nearly the entire population of the United States).  Simply because UT athletics have achieved a level of national prominence does not necessarily mean that the longhorn logo is so ubiquitous and well-known to stand toe-to-toe with Buick or KODAK.  *Moseley*, 537 U.S. at 431 (2003) (citing H.R.Rep. No. 104-374, at 3 (1995)).

Nor is it determinative that well-known corporations pay to sponsor UT.  The University of Florida's media guide lists Nike as an official sponsor.  *See* Florida Gator Football Media Guide, Table of Contents, *available at*  http://www.gatorzone.com/football/media/2007/pdf/2.pdf  (last visited January 29, 2008).  Similarly, on the Florida Gator's home page for its football team there are "Gator Links" to SIRIUS satellite radio and radio behemoth Clear Channel.  *See* http://www.gatorzone.com/football/ (last visited January 29, 2008).  A visit to the University of Michigan's football team's website reveals sponsorships by AT&T and State Farm Insurance.  *See*

M Go Blue Football, http://www.mgoblue.com/Sport/Default.aspx?sid=516&id=12116.[19]  None of

this is evidence that these programs' logos are nationally famous.

One of the major purposes of the TDRA was to restrict dilution causes of action to those few

truly famous marks like Budweiser beer, *see Anheuser-Busch, Inc. v. Andy's Sportswear, Inc.*, 1996

WL 657219, No. C-96-2783 THE, (N.D. Cal. Aug. 28, 1996) (Budweiser's mark "unquestionably

famous"); Camel cigarettes, *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 2004 WL

1613563, No. 99-C-1174 (N.D. Ill. July 19, 2004); Barbie Dolls, *Mattel, Inc. v. Jcom, Inc.*, 1998 WL

766711, No. 97-Civ.-7191 (SS), (S.D.N.Y. Sep. 10, 1998), and the like.  Despite the problems with

Klein's study, the fact remains that UT has not created a genuine issue of material fact that the

longhorn silhouette logo is "a household name."  *Thane Intern.*, 305 F.3d at 911.  As one academic

commentator put it, the "TDRA is simply not intended to protect trademarks whose fame is at all in

doubt."  Barton Beebe, *A Defense of the New Federal Trademark Anitdilution Law*, 16 FORDHAM

INTELL. PROP. MEDIA & ENT. L.J. 1143, 1158 (2006); *see also* Marc L. Delflache et al, *Life After*

Moseley*: The Trademark Dilution Act*, 16 TEX. INTELL. PROP. L.J. 125, 142-43 (2007) (noting that

the TDRA rejects niche fame).  The leading trademarks treatise agrees.  4 J. THOMAS MCCARTHY,

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 24:104, at 24-280-81 (only "truly

eminent and widely recognized marks" should be given the famous label).  Because UT's evidence

fails to demonstrate the extremely high level of recognition necessary to show "fame" under the

TDRA, summary judgment is appropriate on this claim.

---

[19]A similar criticism can be leveled at the SI.com article that UT cites.  This "evidence" is a opinion column by a staff writer at *Sports Illustrated* and is more intended to start a bar discussion than approach anything definitive.

Therefore, the Court RECOMMENDS that KST's motion for summary judgment on UT's federal dilution cause of action be granted.

## RECOMMENDATION

The Court **RECOMMENDS** that the District Court **DENY** Defendant's Motion for Summary Judgment on its Affirmative Defenses of Laches, Estoppel by Laches and Statute of Limitations (Clerk's Doc. No. 37).  The Court further **RECOMMENDS** that the District Court **GRANT IN PART, AND DENY IN PART** Defendant's Motions for Summary Judgment on UT's Federal Dilution, Trademark Infringement, and Unfair Competition Claims (Clerk's Doc. No. 38), granting summary judgment on the Federal Dilution claim, and denying summary judgment as to all other federal claims.

## WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 5th day of February, 2008.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE

## Appendix A

**The University of Texas's Longhorn Silhouette Logo:**



**The Challenged Marks:**

KST's Longhorn Lightening Bolt Logo
(as displayed on website)

KST's Longhorn Lightening Bolt Logo
(as displayed on sign at office)





KST's Discontinued Longhorn Logo

